10, Maritor Transmission v. Eaton Corp. Mr. Chairman. Good morning, Your Honor. I've reserved five minutes for the model. Maritor asks that this Court reverse the District Court's holding of non-infringement of the Sullivan-Sullivan judgment. And to return the case to the District Court for trial from the jury on infringement and damages. But not on Eaton's validity defenses. We believe that those defenses are barred by their loss in the interference involved in this very patent. I think the best place to start for understanding the infringement parties case is with the fact that the Maritor patent and the Eaton Accused devices deal with the same problem, and solve that problem with the same solution. And that problem is torque lock. And torque lock in certain transmissions arises from the fact that there are spur gears and dog punches that get stuck together and can't be moved apart in order to achieve neutral and shifting experience. Yes, but it does make sense that the problem for achieving this result is the same. But would you direct some regards to their point that was dispositive with the District Court's finding that the difference between automatic and manual, the presence or absence of a torque clutch, is controlling the result? Yes, Your Honor. An automatic transmission does not suffer from torque lock. An automatic transmission has planetary gears and works in a different way. The kind of transmission that's coming back here had a torque lock. And Eaton's transmissions suffer from torque lock, and they have to deal with that. But you're not saying it's not automatic, Your Honor? No, it's not automatic, Your Honor. In terms of how that terminology is used in this art, Eaton's devices are not automatic transmissions. They are automated manual transmissions. That's what they're called, automated manual transmissions. They're called manual transmissions because when you look inside the gearbox, you have the kind of gears that I've been speaking of that suffer from torque lock. They're called automated manual transmissions because they've added mechanisms outside the gearbox to move those gears in an automated fashion. However, we're accusing Eaton's devices of infringement when they're operated in their so-called manual mode. These devices have an option to be operated in what's called the manual mode. But only in the first step or throughout the cycle of changing gears. Well, they're manual... But they say that there is no flexibility other than when you start the process. The process is begun in the manual mode by pushing a button by which the driver signals that he's going to make a shift. Once a shift can be done. And on their buttons, you shift one way to signal that an upshift is required, and then the other way if you want a downshift. And then the mechanism practices what we regard as the invention, which is to predict a condition in the engine which will give you close to zero torque in the transmission, and then it guides the engine to that zero torque parameter value. It's what it's called in plane one. They make a lot of arguments about the fact that the actual shifting into neutral is done automatically once that zero torque parameter value is reached, rather than the driver having to move a gearshift himself. But that argument is actually irrelevant to plane one, the only plane I mentioned here. Because plane one does not recite the actual shifting of the gears into neutral. It recites getting the transmission in a condition to be ready to shift into neutral by achieving the zero torque parameter value. It does not go on to discuss the actual shifting of the gears. Other claims have discussed the shifting of the gears, but plane one does not. For example, dependent plane nine recites having a manual shift to shift the gears. But that's not recited in plane one. It's in plane nine, not in plane one. So under the principle of claim differentiation, plane one should be read as not covering the actual shifting of the gears. Excuse me. I'm just saying that the district court construed plane one in my specification, nonetheless to have the distinction. Your Honor, we think the district court is in error in this regard, both as a matter of claim interpretation and as a matter of understanding how the device works. For example, page 22, which is page 23 of the appendix, he says that both automatic and automated manual transmissions do not suffer from torque loss because they have torque converters. I think there's an error on that. That's a true description of an automatic transmission. It's not true of an automated manual transmission, of which Eaton's device is an example. So he misunderstood how the device worked. In addition, he misconstrued the claim, delimited it to so-called manual transmissions. Now here, one has to understand exactly what a manual transmission is. Professor Poff, in his testimony in the Tumult Budget, explains that in this art, a manual transmission is one that has this torque lock problem because it has gears that take the torque lock, the dog clutches, etc. And that's exactly what Eaton's got. Mr. Chairman, do you allege that the repair was made by the lower court, not finding new infringement? Yes, sir. Or equivalence, or infringement by equivalence in both ways? Right. Now, the argument that was presented to the lower court was the mechanical shift actuator. Right? Does the, if you use the device, use a mechanical shift actuator? The way that it works is, if you imagine the box that contains all the gears, there's a little lever that sticks up out of that device. I understand the technology, but it's reasonably well explained. But the question is, is there a mechanical shift actuator required under any of the claims of Pat Forslund's argument? The only claim in issue on this appeal is claim one. And claim one is indifferent to how the gears are actually shifted. So it doesn't care whether there's a mechanical shift actuator or not. Later claims, of which claim nine is an example, recites a manual stick shift. So claim nine, according to your theory, would not be infringed with claim one, would it? That's right. By a mechanical shift actuator. Right. Direct infringement. Direct infringement. Now, let me ask you another question. With regard to DOE, your expert on the interference said 477 does not use a mechanical shift actuator in order to avoid a prior art reference. Your Honor, Dr. Davis was distinguishing the Braun prior art reference. And what his point was is, if you read that entire declaration, it talks about repeatedly, is that in Braun, in the prior art, in the prior heating devices, actually, what they were doing was they would wander around. In fact, the interference board referred to it as aimless. Right? And then they, as it wandered around delivering different levels of torque to the transmission, according to the Braun principle, what you would do is you would lean on that shift lever the whole time. And then, if it happened to hit the right place, it would shift out of gear. The question, Mr. Turner, is really straightforward. Was there a situation in which your expert said the 477 did not include a mechanical shift actuator? What I'm trying to explain, Your Honor, is what he was talking about was that in the Meritor patent, what goes on is that the right level of torque is estimated or approximated. And in the Braun patent, there was no attempt to predict or estimate or determine what the right torque level was. There is one sentence where he says, now, when you look at the 477 patent, you'll find that there are no mechanical shift actuators and there is no forced torque reversal. That's the sentence that Eaton refers to there. The point he's trying to make there is that the Braun reference worked on the basis of aimlessly wandering around and trying to force a torque reversal by leaning on that lever. He was not saying whether or not you needed a mechanical shift actuator in the 477 patent, whether you could have it or not have it. That wasn't Dr. Davis' concern in his declaration. In his declaration, his point was, in the Meritor patent, you go right to a value that you think would be very close to what's needed to get some torque in the drive line. And in fact, this argument that they're making is really a red herring and irrelevant to Claim 1 because Claim 1 does not talk about how the shift is actually made. It's later claims that talk about how the shift is made. That's when you would care about when there's a mechanical shift actuator, but not for the purpose of Claim 1. Right. Which is not an issue here. Thank you, Your Honor. Thank you, Mr. Chairman. Thank you, Your Honor. May it please the Court, John Bernaline on behalf of the Corporation. The accused devices go about solving the problem in a dramatically different way than as claimed in the 477 patent. It's important to reemphasize the fact that throughout the litigation from Day 1, the Meritor continually embraced the Board's claim construction as its own, and the proceedings before the Board are part of the intrinsic evidence here. In distinguishing the broad reference- But the Board wasn't deciding infringement. Correct. They were deciding claim construction issues and priority and validity. There was a proceeding on the validity challenges. So, sure, it's fair to say that they construed the claims as one and one, if you were operating fresh, taking a look as to how a person, whatever, is feeling. I think that's how the Board was construing the claims, Your Honor. They were trying to construe the claims. And, again, Meritor from Day 1 judicially adopted the Board's claim construction as its own. Indeed, but they were construing the claims in light of the interference. In the first instance, to return to your point of view, they claimed the interfering patents were the same. Correct. But they were also construing claim one as part of the invalidity challenge. Even raised the broad reference as part of an obviousness of attack. This Court has emphasized repeatedly that you construe the claims the same way as you do for invalidity, as you do for infringement. In distinguishing Braun, there were two key points that Meritor's Dr. Davis, their expert, made. He said that in the Braun, there is no mechanical shift actuator to automatically cause the gear to change, and there are no torque reversals. The Board itself repeatedly emphasized that simply actuating a mechanical shift actuator, which is exactly what the Eaton Accused devices do, and then ramping down over a wide range of values, that is not sufficient to satisfy the determination requirement in claim one. The determination is a prediction. Dr. Davis, he emphasized that the Braun is a forced torque reversal technique. You start up high, you urge the mechanical shift actuators to pull the gear to neutral, and you're ramping all the way down to zero. That's not what was taught in the 477 Act. It is what the Eaton Accused devices do. The Eaton Accused devices here are very similar to the Braun reference. It is undisputed. In fact, the whole performance of the Eaton systems, there's no factual dispute. Everyone agrees exactly how they operate. The driver presses a button that commands the engine to ramp all the way down to zero gross torque. Eaton's expert in this case, at page 1009 of the Joint Appendix in his expert report, he specifically acknowledges that Eaton's goal in ramping down the torque is to cause a torque reversal. That is exactly how Meritor distinguished the Braun reference. So not only do we have the mechanical shift actuators, which Meritor argued to the board, are nowhere found at all in the 477 Act. We also cause a forced torque reversal, as their own expert concedes in the report that he submitted to the district court judge. But does a torque reversal require it to go through zero, doesn't it? It doesn't require it. We're talking zero gross torque or zero net torque. Zero net torque. Yes. A torque reversal can be either negative torque or positive torque. So it still has to go through zero in order to get there. Correct. In order to get to a negative torque situation, it has to still go through zero. Correct. Correct. Are those required in Claim 1? No. The board was very, very clear. Claim 1 is about predicting a very precise value. The value doesn't have to get you to absolute zero torque. But as the board said, the whole significance of the zero torque parameter value is that torque is low enough such that you're going to be able to pull that gear into neutral. The value that Meritor says is the zero torque parameter value in the Eaton and Keyes devices in the Generation 1 auto shift is 150 foot-pounds. At that value, we use that value to control the mechanical shift actuators that Dr. Davis says are nowhere found in the 477 data. We're going straight through that value all the way down to zero gross torque. We use that value. The value that they claim is our zero torque parameter value, 150 foot-pounds. The shift takes place at zero torque. We put it in both systems. Yes. The shift takes place not at absolute zero torque. The shift takes place wherever torque is low enough that in their system, the driver is going to be able to pull the gear to neutral. Where in our system, those shift motors are going to be firing a full on. So torque has to be low enough. But the value that they say is our zero torque parameter value. By the board's definition, the significance of that zero torque parameter value is that you have low enough torque load to effectuate the shift. Their own expert concedes again in his report that what they say is our zero torque parameter value. That value is too high. We are not able to pull to neutral. For their own expert report, when those shift motors fire to full on. By definition, then, that 150 foot-pounds level cannot be a predicted zero torque parameter value. Why? Because when it fires to full on, we are still not able to get to neutral. We fire to full on like Braun, very similar to Braun. Before we get within range of that zero torque value, we know it's coming. We don't predict exactly where it's going to be. And that's what the whole purpose of the 477 patent is about. But it's the same result per Dr. Coff's expert report. He analyzes those systems. And he concedes that we're not able to get to torque. Whether you use 150 foot-pounds as we did in the earlier generations, as we do in the 75 foot-pounds. And again, the record's undisputed on this, your honor. We reduced it to 75 foot-pounds because the reference torques of the heavy-duty trucks that these transmissions are designed for were about 1,450 to 1,550 foot-pounds. Autoshift Gen 2, when we reduced it to 75 foot-pounds, that was because we wanted the system to be applicable to medium-duty trucks, which have a much lower reference torque in the 750 foot-pound range. The other point I'd like to briefly emphasize is the D3 reference. All of this fits seamlessly within the court's claim construction. When you look at how they distinguish the prior art in the specification, column four, they distinguish the prior art because they say that unlike the prior art where you're pulling the shift knob, that that's what's causing the torque elimination signal. And you've got to be able to separate the two. In column four, they specifically distinguish the type of shift. When I pull that knob, that's what's causing the computer to take over and reduce torque. Then in the EPO, they point to the Eaton shift console, and they specifically tell the EPO that in that shift console, the operator is unable to signal a desire to eliminate torque. The record is undisputed. We put in an expert report in the Declaration of Donald's Foranza, proving that the shift consoles in auto shift and ultra shift are for this purpose identical. In D3, you toggle to U if you want to go up. You toggle to D if you want to go down. In auto shift and ultra shift, you press a button if you want to go up. You press a button if you want to go down. Their own expert was told, we don't want you looking at D3. He put in a shred of evidence in an effort to distinguish this D3 reference. I don't recall the district court finding any of these practices prior to March. Pardon me? I don't recall that the district court came to a conclusion. There was no conclusion, but that is an argument that we submitted to the district court The record is undisputed on that. I think that is a proper basis under this court's precedent, that when the record is complete, argument was presented, even though that argument may not have been a basis for the district court's holding, that this court can still affirm the judgment on that basis, Your Honor. So we would ask that this court... Is that your strongest argument? I don't see how we can take that issue. The record is... I think the strongest argument, Your Honor, is that we... The record is undisputed in that reason. It looks like it has before us. They didn't respond to it at all, even to the district court. There is no factual dispute in this record that the shift consoles... Are you talking about the interference record? I'm talking about the district court procedure. There is no factual dispute whatsoever that the shift console, in auto shift and ultra shift, are identical in terms of what the operator interaction is. There's no factual dispute about whether he was practicing a prior act? As to, for example, invalidating the prior act? No, my argument is much narrower than that. And that's simply with respect to this D3 reference, Your Honor. That they never even put before their own expert the D3 reference. Your Honor, I assume... Were you intending to leave some time? I was intending to, but I've taken up my time. And I'm about to... Is there something you need to tell us that we haven't heard? If we have a minute to do so? Yes, Your Honor. I'll just briefly address Eaton's cross appeal on the question of issue conclusion. First of all, we believe that this is an appropriate cross appeal, given that this would enlarge the judgment in Eaton's rights and its ability to assert invalidated offenses in the event that this is returned to the trial court. I believe that the briefs address both the issue conclusion and claim conclusion issues in full. And we would ask that the courts review that and overrule the district court's decision to grant issue preclusive effect to Eaton's invalidated offenses based on the prior evidence. Thank you, Mr. Chairman. Mr. Chairman. Your Honor. Eaton's accused device is not a practice in the private markets, practicing its claim in Claim 1 of the 477 Act. The reference to the EPO proceedings, that's another red herring. The claim at issue in the EPO was different than Claim 1. I think so. It would be helpful to me if you used your time to appreciate your argument that Claim 1 needs to be interpreted, construed more broadly than the limitations that the district court concluded need to be readied to Claim 1 because of its specification. Yes, Your Honor. I see the bottom line of the distinction. I think in order to understand that, one has to appreciate the use of the word manual, and to be clear on what's manual and what's not. As Professor Hoff explains in his declaration, in this art, when they refer to a manual transmission, most of the time an engineer will be referring to what's inside the gearbox. What's inside the Eaton gearbox is the same in the accused devices as in their manual shift transmissions. They're all transmissions which suffer from this problem of torque loss, which is the very kind of transmission that's talked about in our specification. So if one were to say that Claim 1 is limited to manual transmissions in that sense, in the sense that they deal with transmissions with torque loss, there would be a problem. Sometimes the word manual is also used to infer the fact that the operator has to do something to initiate the process. Well, Eaton has that, too. It has that button that can push to signal an upshift or a downshift, and that's the only operator input that's required by Claim 1. So if one were to say, use manual in those two sentences of the word, then we would have no quarrel with calling Claim 1 manual, because in fact there are claim limitations that talk about the operator input and about the use of torque. Where the district court went astray was to say that Claim 1 is limited to manual shift transmissions in the sense that the gearshift has to actually be done by the muscle power of the driver. That's the error in complaining about, with respect to his interpretation of the term transmission in Claim 1. That's not recited anywhere in Claim 1. The word manual is not in Claim 1. The word manual is used in other claims in the patent, but not in Claim 1. In fact, their own attorney admitted that the ordinary meaning of the word transmission includes both manual and non-manual transmissions. But if the evidence does show that the issue was limited to a manual transmission, is that limited to Claim 1? Is that what Dr. Davis said during the affidavit proceedings, in order to get around the problem? No, that's not what Dr. Davis is talking about, Your Honor. He was not talking about- He was puzzled by the statements that he made during the various proceedings in order to win the Braun reference. Because on the one hand, he was saying that the piece of the algorithm to accurately predict the zero torque value, right, rather than the force-torque reversal, which is used by Braun. That was the distinction he was making, Your Honor. So what does that mean? Is it one automatic and the other is manual? Pardon me? Is it one automatic because there is an automatic determination of the torque reversal? No, Your Honor. The automatic or manual part is not what Dr. Davis was talking about. What he was talking about was in the prior art, in the Braun patent, you didn't know when you were going to hit or get near zero torque. You were just going to vary the level of fuel in the engine to vary the level of torque being delivered to the transmission. Is that what he called the force-torque reversal? That's part of the force-torque reversal system as taught by Braun. Braun would do big variations like this, figuring if you varied it enough, you would hit it someplace in there. It's like walking up and down the street, figuring somewhere or another I'll find the building I'm looking for if I wander through enough blocks in the city of Washington. That's what Braun did. What DeSotel's 477 patent does is if you look at what the engine is doing, you can predict a zero-torque parameter value for the engine. If you go to that value, you would get very close to zero torque. Approximate is the term used in the patent. Dr. Davis' point was that in Eaton, you didn't know where it was going to happen, whereas in the 477 patent, you predict where it's going to go and then you guide the engine to that point, which is exactly what Eaton does. That was his point. It was not about how you shift gears, which is just not in the public life. It's in other claims, but not in the public. Thank you both.